# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAURA GRAY, IAN LEY, AND JIM LOEFFLER, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>WHIRLPOOL CORPORATION,<br><br>              Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Laura Gray, Ian Ley, and Jim Loeffler ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, allege as follows based upon personal knowledge as to their own acts and experiences, and as to all other matters, upon information and belief, including the investigation conducted by Plaintiffs' counsel.

## INTRODUCTION

1.    Plaintiffs bring this class action against Defendant Whirlpool Corporation ("Whirlpool") on behalf of themselves and all similarly situated consumers who purchased certain JennAir-branded double wall ovens (the "Class Ovens") manufactured by Whirlpool. The Class Ovens suffer from a design and/or manufacturing defect that results in a short in the control board, renders the entire oven completely inoperable, and makes the ovens virtually certain to fail well before the end of the ovens' expected useful life (the "Defect").

2.    The Defect was, and is, present in all Class Ovens at the time of sale. The Defect frequently manifests after only a few short years of use. Many consumers have experienced the defect within the two-year express warranty period, and very often it occurs shortly after the

1

expiration of the two-year express warranty period. When the Defect manifests, the Class Ovens display error code F2E1, which indicates a stuck or shorted key, and the control panels become completely unresponsive to user commands. In other words, users cannot operate their ovens. As a result of the Defect, therefore, the Class Ovens are unable to perform even the most basic intended function of an oven—cooking food.

3.      The Class Ovens remain inoperable until the control panel is replaced. But a replacement typically costs consumers over $1,500. Further, because the defect is so prevalent, replacement parts are on lengthy backorder. Worse still, the replacement control panels suffer from the same Defect and are highly likely to fail again, and, therefore, Whirlpool has offered no adequate repair. Many consumers have reported repeat failures because replacing the board after it fails does not fix the underlying Defect.

4.      Whirlpool markets JennAir as "a premier high-end kitchen appliance brand because of its durable, exceptional appliances."[1] As such, the Class Ovens command a premium price. Having spent thousands of dollars for a JennAir oven, Consumers reasonably expect these ovens to function for ten years or more.[2] Yet, because of the Defect, these Class Ovens virtually always fail in less than five years.

5.      Whirlpool has known about the Defect for years and certainly by 2020. By at least 2017, consumers began complaining online about the Defect on sites that Whirlpool monitors. Whirlpool also knew about the Defect as a result of its receipt of direct communication from consumers and receipt of in-warranty claims.

6.      Despite knowing about the Defect, Whirlpool failed to disclose it to unsuspecting

---

[1] JennAir, https://www.jennair.com/blog/high-end-kitchen-appliances.html.
[2] Consumer Reports, https://www.consumerreports.org/cro/news/2009/03/by-the-numbers-how-long-will-your-appliances-last-it-depends/index.htm.

consumers who paid a premium price for their Class Ovens. Instead of addressing the issue, Whirlpool shifted the burden of repair costs onto consumers. Whirlpool knew that the Defect would cause a premature failure of a substantial percentage—if not all—of the Class Ovens, yet it chose not to disclose the Defect to consumers.

7.      Accordingly, Plaintiffs bring this class action against Whirlpool for its breaches of the implied warranty of merchantability, breaches of express warranty, violations of state consumer protection statutes, and common law fraud. Plaintiffs seek monetary, injunctive, and other appropriate relief for damages they and all similarly situated consumers suffered and continue to suffer.

## JURISDICTION AND VENUE

8.      This action is properly before this Court, and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Whirlpool, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

9.      In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

10.     This Court has personal jurisdiction over Defendant because it has consented to jurisdiction by registering to conduct business in Pennsylvania. *See* 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b); *Mallory v. Norfolk Southern Ry.*, 600 U.S. 122, 128 (2023). Additionally, Defendant maintains sufficient minimum contacts in Pennsylvania and otherwise intentionally

avails itself of the markets within Pennsylvania through promotion, sale, marketing, and distribution of its Class Ovens, which renders the exercise of jurisdiction by this Court proper and necessary.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Plaintiffs may properly sue Whirlpool in this District because a substantial part of the events and/or omissions giving rise to the claims occurred in this District and because Whirlpool caused harm to Class members residing in this District, including Plaintiff Ley.

<u>**THE PARTIES**</u>

A.     <u>**Plaintiffs**</u>

**Plaintiff Gray**

12.     Ms. Gray is a citizen of Illinois. She purchased two Class Ovens, in 2018 and 2021, respectively, both of which failed from the Defect within less than three and a half years, and which cost her more than $4,761 in total purchases.

13.     In February 2018, Ms. Gray purchased her first JennAir Double oven from Lorenz Appliance for about $3,999, plus installation costs, which was delivered on July 27, 2018. That oven's control panel failed as a result of the Defect in April 2021. The oven displayed the F2E1 error code, which also displayed the following message on the screen: "This product is experiencing a problem and can no longer be used. For service, contact Jenn-Air: 1-800-536-6247 www.jennair.com." *See infra* ¶ 55. Ms. Gray contacted Whirlpool, and it sent out an authorized service technician who informed Ms. Gray that her oven required a control panel replacement, under warranty, after displaying the F2E1 error code.

14.     But because the replacement control panels were on a two-month long backorder, Whirlpool offered instead, and Ms. Gray purchased, a new JennAir Double Oven from Whirlpool

for $762 (model JJW383IL01), and the oven was delivered on July 14, 2021. At that time, Whirlpool did not disclose that the replacement Class Oven would also contain the same Defect. By December 2024, the replacement oven also failed as a result of the Defect and displayed the F2E1 error code and displayed the same message to contact JennAir for service. By January 2025, the oven was completely inoperable. Ms. Gray again contacted Whirlpool. In February 2025, a Whirlpool-authorized technician informed Ms. Gray that a control panel replacement was necessary, and it would cost her $1,344.53. Ms. Gray initially proceeded with the control panel replacement, but the parts were on back-order for an unknown amount of time. While waiting for the back-ordered parts, Ms. Gray began shopping for a replacement oven and, ultimately, purchased a Frigidaire oven for about $1,777 to replace her defective JennAir. If she had not purchased a replacement oven, she would still be without a functioning oven as the service technician informed her that the control panel parts are still on back-order as of May 21, 2025, with no date in sight for the parts to become available.

15.     Before making her purchase of her initial Class Oven in 2018, Plaintiff Gray researched JennAir double ovens and reviewed information regarding the oven on Jennair's website. Plaintiff Gray also viewed a floor model at Lorenz Appliance. The oven was advertised as being high-end, durable, high-quality, and reliable. None of the information Plaintiff Gray reviewed or to which she was exposed disclosed the Defect, even though Whirlpool knew about it. Before purchasing her replacement Class Oven in 2021, Ms. Gray conducted similar research. She researched three different JennAir models, all of which were represented to be high-end, durable, high-quality, and reliable. Whirlpool also represented to Ms. Gray that the replacement oven was a better, higher-quality model than her original Class Oven. Further, Ms. Gray believed her original oven simply had a one-off defective control panel. She had no reason to suspect that

Whirlpool was aware of—and failed to disclose—a widespread defect affecting all Class Ovens, including the replacement unit she later purchased. Whirlpool did not disclose the Defect to Plaintiff Gray even though it unquestionably knew about it.

16.     A properly functioning oven—capable of performing its basic function of cooking food—was important to Ms. Gray's purchase decision. Equally important to Plaintiff's purchase decision were Whirlpool's representations that its ovens were high-end, durable, high-quality, and reliable. Relying on these assurances, Ms. Gray paid a premium for her Class Ovens. Had Plaintiff been aware of the Defect at the time of purchase, she would have either not purchased the ovens or purchased them for a substantially lower price.

17.     On April 30, 2025, through her counsel, Ms. Gray sent a letter to Whirlpool notifying it of its breaches of express and implied warranties, demanding relief on behalf of herself and all others similarly situated, and notifying Whirlpool of her intent to bring claims alleged herein if Whirlpool did not comply.

**Plaintiff Ley**

18.     Mr. Ley is a citizen of Pennsylvania and currently resides in Washington County. Mr. Ley also purchased two Class Ovens, in 2016 and 2022, respectively, both of which failed from the Defect within a few years and which cost him more than $10,300 in total purchases and repairs.

19.     In September 2016, Mr. Ley purchased his first JennAir double oven from Bridgeville Appliance, located in Bridgeville, PA, for about $4,700. At the end of 2021, that oven's control panel failed as a result of the Defect and displayed the F2E1 error code. Mr. Ley contacted Whirlpool, which sent out an authorized service technician to diagnose his oven. The technician informed Mr. Ley that his oven required an expensive control panel replacement. Mr. Ley tried to

order the replacement parts, but the parts were on backorder for an unknown amount of time.

20.     After waiting over six months for the replacement parts—and without a functioning oven and with no sign of the backordered parts—Mr. Ley instead purchased a new replacement Class Oven. Specifically, in July 2022, Mr. Ley purchased a JennAir double oven (model no. JJW3830) from Bridgeville Appliance for $4,139.83. Whirlpool did not disclose that the replacement Class Oven would also contain the same Defect.

21.     In November 2024, the control panel on Mr. Ley's replacement oven failed and displayed the same F2E1 error code. Mr. Ley contacted Whirlpool, who again sent out an authorized service technician, which informed him that because his oven was out of the limited warranty period, he would have to pay over $1,500 for a replacement control panel. After waiting for parts, Mr. Ley's control panel was replaced. The replacement, however, cost Mr. Ley over $1,500—nearly 40% of the oven's purchase price within only 27 months of purchase.

22.     Before making his purchase of his initial Class Oven in 2016, Mr. Ley researched JennAir double ovens and reviewed information regarding the oven on JennAir's and Bridgeville Appliance's website. The oven was advertised as being high-end, durable, high-quality, and reliable. None of the information Mr. Ley reviewed or to which he was exposed disclosed the Defect, even though Whirlpool knew about it. In 2022, to replace his defective original Class Oven, Mr. Ley purchased the same model from Bridgeville Appliance. Further, Mr. Ley believed his original oven simply had a one-off defective control panel. He had no reason to suspect that Whirlpool was aware of—and failed to disclose—a widespread defect affecting all Class Ovens, including the replacement unit he later purchased. Whirlpool did not disclose the Defect to Plaintiff Ley even though it unquestionably knew about it.

23.     A properly functioning oven—capable of performing its basic function of cooking

food—was important to Mr. Ley's purchase decision. Equally important to Plaintiff's purchase decision were Whirlpool's representations that its ovens were high-end, durable, high-quality, and reliable. Relying on these assurances, Mr. Ley paid a premium for his Class Ovens. Had Plaintiff been aware of the Defect at the time of purchase, he would have either not purchased the ovens or purchased them for a substantially lower price.

24.     On April 14, 2025, through his counsel, Mr. Ley sent a letter to Whirlpool notifying it of its breaches of express and implied warranties, demanding relief on behalf of himself and all others similarly situated, and notifying Whirlpool of his intent to bring claims alleged herein if Whirlpool did not comply.

**Plaintiff Loeffler**

25.     Mr. Loeffler is a citizen of Ohio. Between November 2020 and November 2024, he had four oven failures due to the Defect.

26.     In November 2020, Mr. Loeffler purchased a JennAir Double Oven, model no. JJW2830Il01, from Big Sandy Superstore in Dublin, Ohio for about $4,400. Mr. Loeffler also purchased a Whirlpool extended warranty, which will expire in November of 2025.

27.     Within a year, in November 2021, Mr. Loeffler's oven experienced its first control panel failure due to the Defect and displayed the F2E1 error code. Mr. Loeffler contacted Whirlpool, and Whirlpool dispatched an authorized technician who informed him that his oven needed a control panel replacement. Whirlpool replaced the control panel under warranty.

28.     Less than a year later, in June 2022, the replacement control panel failed and displayed the F2E1 error code. Mr. Loeffler again contacted Whirlpool, and Whirlpool again sent out an authorized technician who informed him that his oven needed another control panel replacement. Whirlpool again replaced the control panel under warranty.

29.     Five months later, in November 2022, the second replacement control panel failed, displayed the F2E1 error code, and disrupted Mr. Loeffler's Thanksgiving holiday. After this incident, Mr. Loeffler contacted Whirlpool and requested a replacement oven from Whirlpool customer service, but Whirlpool denied his request. Instead, Whirlpool replaced, again, the control panel for the third time under warranty.

30.     On November 3, 2024, his oven's control panel failed for the fourth time, again displaying the F2E1 error code. The control panel was on backorder, however, for over two months. Mr. Loeffler was without a functioning oven over the Thanksgiving and Christmas holidays. In January 2025, Whirlpool again replaced Mr. Loeffler's control under his extended warranty.

31.     Before making his purchase of his Class Oven in 2020, Mr. Loeffler researched JennAir double ovens and reviewed information regarding the oven on JennAir's website. Mr. Loeffler also viewed a floor model at Big Sandy Superstore. The oven was advertised as being high-end, durable, high-quality, and reliable. None of the information Mr. Loeffler reviewed or to which he was exposed disclosed the Defect, even though Whirlpool knew about it.

32.     A functioning oven—and its basic function of cooking food—and Whirlpool's representations that its ovens were high-end, durable, high-quality, and reliable were important factors in Mr. Loeffler's decision to purchase his oven, for which he paid a premium. Had Plaintiff been aware of the Defect at the time of purchase, he would have either not purchased the oven or purchased it for a substantially lower price. Mr. Loeffler's new control panel, however, contains the same Defect, and it is highly likely that it too will fail.

33.     On November 14, 2024, through his counsel, Mr. Loeffler sent a letter to Whirlpool notifying it of its breaches of express and implied warranties, demanding relief on behalf of himself

and all others similarly situated, and notifying Whirlpool of his intent to bring claims alleged herein if Whirlpool did not comply.

**B.    <u>Defendant</u>**

34.    Defendant Whirlpool Corporation is a corporation registered to do business in Pennsylvania, maintains active status of its registration with the Pennsylvania Department of State, is organized and existing under the laws of Delaware, and maintains a principal place of business at 2000 N. M-63, Benton Harbor, Michigan 49022.

35.    Whirlpool is a global designer, manufacturer, retailer, and marketer of home appliance products from laundry machines to cooking appliances. Whirlpool sells its products in all 50 states. Whirlpool owns many known household brands such as KitchenAid, Maytag, JennAir, and others.[3] In 2024, Whirlpool reported approximately $17 billion in annual sales, of which cooking appliances, including ovens, represented 24%.[4]

36.    Whirlpool promotes, markets, and advertises its Class Ovens directly to consumers.

37.    Whirlpool sells its JennAir-branded Class Ovens to consumers directly online and through its network of authorized retailers, like those from which Plaintiffs' purchased. Upon information and belief, Whirlpool provides its authorized retailers with promotional and advertising information and materials to, in turn, provide to the ultimate consumers of Whirlpool products.

38.    Whirlpool also directly provides consumers with a limited warranty, which covers Class Ovens regardless of whether the consumers purchased directly from Whirlpool or one of its

---

[3] *See* Whirlpool, Our Brand Portfolio, available at https://www.whirlpoolcorp.com/brands-we-love/.
[4] Whirlpool's 2024 10-K Annual Report at 6, available for download at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000106640/5b06e788-b0de-4da8-9019-bdcb9cdde238.pdf.

authorized retailers.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**A.**      **<u>The Defect</u>**

39.      As discussed above, the Class Ovens are double wall ovens, which means they appear as two ovens stacked on top of each other and controlled by one panel. These ovens are installed within the consumer's walls or cabinetry:[5]



40.      The control panel is located at the top of the double ovens. The front-facing portion of the control panel is a touch screen. Immediately below the panel is a series of slats, which collectively form a vent.[6]

---

[5] Image source: https://www.ajmadison.com/cgi-bin/ajmadison/JJW3830DS.html.
[6] Image source: https://www.ajmadison.com/cgi-bin/ajmadison/JJW3830DS.html?srsltid=AfmBOop6-3rfGi2EIKimutmaRgoX7mFrsWsN0wbfNIzu7EzUPItIkB0J.

Control panel and touchpad



Vent

41.     The front of the control panel is glass and is touch sensitive. Specifically, the glass panel is a capacitive touchscreen. Capacitive touchscreens respond to a light touch of the finger by sensing the change in capacitance caused by the finger. Capacitive touchscreens rely on stable and very low-resistance electrical connections. In other words, when the screen or button area is lightly touched, the finger introduces a slight change in the electrical current, which alters the measured capacitance. The control panel detects this change and responds with the appropriate command.[7] Accordingly, the control panel is highly sensitive to changes in capacitance.

42.     When the oven is used in the ordinary fashion, heat and steam rise from the vent through the control panel. Upon information and belief, because of poor design and/or defective materials, the heat and steam causes oxidation of the control panel's circuitry. Oxidation is a chemical process in which metals react with oxygen or moisture and create oxides. This creates a short or otherwise disrupts the signals sent between parts of the circuit, and it tricks the oven's

---

[7] *See generally* Hyoungsik Nam et al., *Review of Capacitive Touchscreen Technologies: Overview, Research Trends, and Machine Learning Approaches*, Sᴇɴsᴏʀs, July 13, 2021, at 1, 4-5, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8309784/.

control panel into thinking a button is being pressed.

43.     As a result, the control panel believes that a button on the touchpad is being pressed for an extended period of time, even though no button is pressed at all. Consequently, the Class Ovens display error code "F2E1," which indicates a stuck or shorted key. When the F2E1 error code is displayed, the Class Ovens cannot be used.

44.     Restarting the oven by turning the circuit breaker off and back on might momentarily remove the F2E1 error but does not resolve the Defect, as the F2E1 error code comes right back typically after only a few minutes.

45.     The Defect manifests within a few short years of ownership and well before the end of the oven's expected life. Most consumers report the F2E1 error code and a complete failure within two to five years. Consumers, however, reasonably expect ovens, especially "high-end" brands, to last at least ten years or more.

46.     The only purported repair that Whirlpool offers is to entirely replace the control panel. But the control panels are expensive, typically costing consumers over $1,500 to replace. Due to the pervasiveness of the Defect, however, the control panels are on a months-long backorder. Worse still, the expensive replacement suffers from the same exact Defect and is virtually certain to fail within a few short years of installation. Thus, Whirlpool has offered no adequate repair for the Defect.

47.     The Defect was (and is) present in all Class Ovens at the time of sale. Whirlpool manufactured these ovens using inadequate parts, materials, and/or design, which renders the control panels highly susceptible to oxidation and virtually certain to fail long before the ovens' expected useful life. This latent defect existed at the time of sale but could not have been discovered by Plaintiffs or other Class Members through reasonable inspection.

**B.**     **Whirlpool's Knowledge and Concealment of the Defect**

48.     Whirlpool has known of the Defect as early as 2017 and certainly by 2020, yet it continues to deny its existence.

49.     As early as 2017, consumers began reporting the Defect online. Some of the earliest complaints were made on ConsumerAffairs.com, which, upon information and belief, Whirlpool monitors. Moreover, many of the complaints state that the consumer—in addition to posting online—contacted Whirlpool directly or had multiple in-warranty replacements due to the Defect.

50.     On February 11, 2017, a consumer posted: "After two years of light use, the control board failed while roasting cherry tomatoes giving us a message F2E1: Stuck/Shorted Key. Because the Jenn-Air unit is out of warranty, **we called a reputable service technician who knew right away that the control board would have to be replaced without touching the unit because he has seen so many of these fail. The unit vents heat and moisture from the oven right below the control pad, which eventually destroys the circuitry.** He told us Bosch wall units vent from the bottom, and he's never been called out to replace a control panel on a Bosch." This consumer also reported their failure directly to Whirlpool: "So we called the 800 number and were directed to Whirlpool Factory Service."[8]

---

[8] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3.



**R**

Robert
Irvine, CA

★★★★★

Customer Service   Coverage   Price   Punctuality & Speed   Staff   Reliability

Reviewed Feb. 11, 2017

We purchased the Jenn-Air Electric In-Wall Oven Model JJW243WP02 as part of a package including a range and refrigerator. Very sorry we did. After two years of light use, the control board failed while roasting cherry tomatoes giving us a message F2E1: Stuck/Shorted Key. Because the Jenn-Air unit is out of warranty, we called a reputable service technician who knew right away that the control board would have to be replaced without touching the unit because he has seen so many of these fail. The unit vents heat and moisture from the oven right below the control pad, which eventually destroys the circuitry. He told us Bosch wall units vent from the bottom, and he's never been called out to replace a control panel on a Bosch.

Fortunately, the part has a 5-year warranty, probably because Jenn-Air/Whirlpool knows that this is a serious design flaw, and given the cost of the part, consumers were justifiably livid that such an expensive oven would suffer such a serious defect. So we called the 800 number and were directed to Whirlpool Factory Service. They told us that the unit was out of warranty without telling us that the part was still covered, apparently in hopes of duping us into paying the $1000-$1500 for the part alone, plus the labor, which they estimate at over $100. That started another saga.

It has now been nearly a month and still no service. Instead, Whirlpool scheduled a date to fix it, then didn't show even though my spouse stayed home from work to let them in. When she called for an ETA, Whirlpool's tech, Todd, told her that the part hadn't arrived yet. No apology from Whirlpool. So my spouse rescheduled to a date 9 days later, when I stayed home from work. Three hours into the 4-hour window for the service call, my spouse texted Todd the service tech. No response. After 5.5 hours of waiting at home I left Todd a voice message, and he never responded to that, either. Finally, I called the 800 number, and was told by Ebony that the first service call had to be rescheduled because Whirlpool incorrectly ordered the part, not because it was late arriving, as Todd had told my spouse when she called after the first aborted service visit!

In addition, Ebony, to her credit, told me that the notes in their file stated that Whirlpool waited a full week after the first aborted service visit to order the correct part, and that it wouldn't arrive for another week, so they had reschedule the second visit without telling us! Ebony tried to transfer my call to Ross, her manager, but she discovered that their phone system was malfunctioning and couldn't transfer calls. She promised that a manager, Ross, would call me back within half an hour. An hour and a half later, I called and Ebony told me that the manager Consuela, not Ross, had left early that day! But she told me that the part had arrived and she was working diligently to get a service tech out that day, and she would call by 4:00 when her shift ended to let me know the status.

In addition, Ebony, to her credit, told me that the notes in their file stated that Whirlpool waited a full week after the first aborted service visit to order the correct part, and that it wouldn't arrive for another week, so they had reschedule the second visit without telling us! Ebony tried to transfer my call to Ross, her manager, but she discovered that their phone system was malfunctioning and couldn't transfer calls. She promised that a manager, Ross, would call me back within half an hour. An hour and a half later, I called and Ebony told me that the manager Consuela, not Ross, had left early that day! But she told me that the part had arrived and she was working diligently to get a service tech out that day, and she would call by 4:00 when her shift ended to let me know the status.

At 4:10 I called AGAIN, and was told by Sandy that Ebony was mistaken, the part had NOT arrived yet. I also learned to my dismay that Ebony had not made any notes documenting my prior calls, so I pleaded with Sandy, to please take and enter notes of what had happened to my spouse and I so we didn't have to explain every time we called back. She said she took detailed hand-written notes so she could enter it in after the call. I hope she did, because I do not want to have to relate this all over again the next time I have to call. Sandy also told me that Consuela would call me on Monday to hear my complaint. She also gave me the address of Whirlpool's corporate office so I can send a letter and demand that Whirlpool cover the cost of the labor to fix their defective product after bungling two service calls.

So, after two missed days of work and over a month without a functional wall oven that cost over $2500, Whirlpool STILL hasn't fixed the issue. I am searching to see if there is a class action lawsuit we can join or perhaps initiate against Whirlpool, both for its fraudulent marketing of a product with a known defect that they will not cover, for its fraudulent attempt to dupe us into paying for the part, which costs more than half the full cost of the unit, and finally for two days of wasted time waiting for their service technician when they had, without informing us, cancelled the service calls because of their own incompetence.

Less

👍 Thanks Robert (36)    Report

51.      On August 7, 2018, another consumer posted that in less than a year his wall oven failed due to the Defect, and he contacted Whirlpool directly: "Purchased Jenn-Air wall oven JJW2427DB, it was installed Sept. 2017. With little use since purchase, not being used for at least a month, and while not being used at the time, the oven suddenly began beeping with error code F2E1. I called Jenn-Air for service and received a confirmation."[9]

_____

[9] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3.



52.     On December 19, 2018, another consumer posted that she had her original control

panel fail as well as her replacement control panel—all within two years of ownership: "WALL

OVENS - ATROCIOUS, they should be recalled. Dec 2016 (approx. six months after the

purchase) they stopped working. After many frustrating calls and complaints, they replaced the

board on Dec 23, 2016. Now Dec 2018, exactly the same problem almost to the day, F2E1 stuck,

shorted key."[10]

---

[10] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#scroll_to_reviews=true.



53.     On January 9, 2019, another consumer had a failed control panel: "My oven is just over 3 years old and I already need to replace a $1300 Control Panel. That is over 20% of the price of the oven itself. W**hat appears to be the issue with the oven is it vents heat/steam from the top of the oven door - just below the electronic control panel.** Moments before I received the F2E1 error I noticed that condensation from the vent was collecting behind the control panel's glass cover. What a ridiculous design."[11]



54.     On August 8, 2019, another consumer reported that she received the F2E1 error

---

[11] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#scroll_to_reviews=true.

message. She then contacted Whirlpool customer service, which informed her that she "need[ed] a new control board . . . ."[12]



55.     On November 19, 2019, a consumer posted that his oven received the "dreaded F2E1 Shorted/Stuck Key error message" after three years of ownership. The consumer also posted a photo of the F2E1 error message on his oven:[13]



---

[12] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#scroll_to_reviews=true.
[13] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#scroll_to_reviews=true.



56.     On December 8, 2020, another consumer posted: "Wall oven control panel error requires new control panel. Reported to Jenn-Air on October 13, 2020. Advised by [Whirlpool customer service] to expect a telephone call from service technician."[14]



57.     On January 21, 2021, another consumer posted that she has gone through three different JennAir ovens, all of which suffer from a failed control panel.[15]

---

[14] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#sort=recent&filter=1.

[15] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#sort=recent&filter=1.



58.    On April 9, 2021, another consumer reported that: "Within three years my oven displayed the F2E1 code again. The first time it was under warranty. The second time I'm expected to pay over $1,000.00 to have it repaired."[16]



59.    On October 4, 2021, another consumer posted that his double wall oven failed after two short years as a result of the Defect.[17]

---

[16] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=3#scroll_to_reviews=true.
[17] Consumer Affairs, https://www.consumeraffairs.com/homeowners/jenn-air_wall_ovens.html?page=2#scroll_to_reviews=true.



60.    On April 11, 2022, another consumer reported that his Class Oven was inoperable due to the Defect, and there was no available repair because the parts were out of stock.



61.    On other websites and forums too, consumers reported control panel and oven failures as a result of the Defect.

62.    For example, on a forum called PartsDr.com, a consumer started a thread on May 3, 2019, related to the Defect, which collected over 76 posts between 2019 and 2025.[18]

---

[18] Parts Dr. Forum, https://forum.partsdr.com/showthread.php?3989-FIXED-Jenn-Air-F2-E1-stuck-key-error.



63.     One consumer astutely noted in October 2023, that "the F2E1 stuck key error is caused by oxidation in the low profile connector ... identified. These are very low voltage, low current signals and the connector contacts are highly susceptible to oxidation, which forms in a humid environment like an oven or microwave. They should have been gold plated, but even Jennaire tries to cut costs." The consumer also posted a photo.





64.    Whirlpool monitors consumer complaints and forums on the internet, such as the foregoing, as part of its quality control process and in order to identify product defects or issues.

65.    Consumers also reported the Defect directly to Whirlpool through Jennair's X (formerly Twitter) page.

66.    For example, on September 11, 2019, a consumer posted: "@jennair. My double oven (jjw2830ds) has died for the 2nd time in 3 years. F2E1 shorted key. This is oven is too expensive to be so bad. My (expensive/extended) warranty will be out soon and I cannot trust that the repair will last a year. So frustrated!" And Whirlpool responded to the post on the same day.[19]

---

[19] Tenely Smith (@justtenely), X, https://x.com/justtenely/status/1171789340164407297 (Sept. 11, 2019).



67.    These complaints just scratch the surface, however, as Whirlpool's internal customer-complaint database and warranty-claims system undoubtedly contain hundreds or thousands of consumer complaints and warranty claims related to the Defect.

68.    In addition to these consumer complaints, as evidenced by the above complaints and posts, Whirlpool has received direct consumer communication regarding the Defect and in-warranty claims from consumers.

69.    Consumers may contact Whirlpool customer service by phone, email, and chat.[20] When a consumer complains directly to Whirlpool through one of these channels, Whirlpool tracks and aggregates that data in a sophisticated database that it can use to identify patterns for quality control issues. As indicated in the above posts, Whirlpool customer service has been receiving

---

[20] Whirlpool, https://www.whirlpool.com/services/contact-us.html.

direct communication from consumers notifying it about the widespread Defect since at least 2017. *Supra* ¶ 50. Given that consumers have been reporting the Defect to Whirlpool directly for over seven years, upon information and belief, Whirlpool knew of the Defect by virtue of these direct complaints.

70.     Similarly, Whirlpool tracks and aggregates warranty-claim data. When a consumer submits a warranty claim to Whirlpool or one of its authorized service companies, Whirlpool will, for example, assign the claim a unique reference number, coordinate and communicate with the local authorized service company to collect information regarding the service, tracks and collect defective parts, and track and analyze parts moving in and out of its warehouses. Whirlpool tracks and aggregates warranty data in a sophisticated database that it can use to identify patterns for quality control issues. As indicated in the above posts, consumers have been making warranty claims to Whirlpool regarding the Defect since at least 2018 (*supra* ¶ 52). Upon information and belief, Whirlpool has known about the Defect as a result of the high volume of in-warranty claims.

## TOLLING OF STATUTES OF LIMITATION

71.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Ovens and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. Defendant continues to deny the existence and extent of the Defect.

72.     Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or that the Class Ovens contained the Defect. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period

of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

73.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Ovens and to disclose the Defect due to its exclusive and superior knowledge of the existence and extent of the Defect in Class Ovens.

74.     Defendant knowingly, actively, and affirmatively concealed the facts alleged herein.  Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

75.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS DEFINITIONS AND ALLEGATIONS

76.     Plaintiffs bring this action and seek to certify and maintain it as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), individually and on behalf of the following Classes.

**Nationwide Class:** All persons in the United States who purchased one or more Class Ovens.

**Illinois Subclass**: All persons in Illinois who purchased one or more Class Ovens.

**Ohio Subclass**: All persons in Ohio who purchased one or more Class Ovens.

**Pennsylvania Subclass**: All persons in Pennsylvania who purchased one or more Class Ovens.

77.     Excluded from the Classes are: (i) Whirlpool; (ii) Whirlpool's employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or

affiliates; (iii) governmental entities; (iv) all persons who make a timely election to be excluded from the Classes; and (v) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family.

78.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes and/or to add Subclasses if necessary before the Court determines whether certification is appropriate and as the Court may otherwise allow.

79.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

80.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

81.     *Numerosity*: The members of the proposed Classes are so numerous and geographically dispersed that the individual joinder of all Class members is impracticable. Plaintiffs believe that the Class contains thousands of purchasers of Class Ovens who have been damaged by Whirlpool's conduct. While the exact number of Class members is unknown to Plaintiffs at this time, it is in Whirlpool's control, and it is ascertainable by appropriate discovery including through Whirlpool's sophisticated databases.

82.     *Commonality and Predominance*: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including, but not limited to:

      i.     Whether Defendant engaged in the conduct alleged herein;

     ii.     Whether Defendant placed the Class Ovens into the stream of commerce in the United States with knowledge of the Defect;

    iii.     Whether the Class Ovens were unmerchantable;

iv.    Whether Defendant knew or should have known of the Defect, and if so, for how long;

v.    When Defendant became aware of the Defect in the Class Ovens;

vi.    Whether Defendant knowingly failed to disclose the existence and cause of the Defect in the Class Ovens;

vii.    Whether Defendant's omissions about the Class Ovens were reasonably likely to deceive with regards to the functionality and expected longevity of the Class Ovens;

viii.    Whether Defendant's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

ix.    Whether Plaintiffs and Class Members overpaid for their Class Ovens as a result of the Defect;

x.    Whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of use of their Class Ovens;

xi.    Whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Defendant's conduct alleged herein, and if so, the amount or proper measure of those damages; and

xii.    Whether Plaintiffs and Class Members are entitled to injunctive relief.

83.    *Typicality*: Plaintiffs' claims are typical of the claims of all Class members. Plaintiffs, like all Class members, purchased Class Ovens that contain the Defect. Plaintiffs, like all Class members, would not have purchased, or would have paid substantially less for, the Class Ovens had they known of the Defect or that Whirlpool would respond inadequately when the Defect manifested.

84.    *Adequacy of Representation*: Named Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The Class members' interests will

be fairly and adequately protected by Plaintiffs and their counsel.

85.    *Superiority*: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

86.    *Injunctive Relief*: Whirlpool has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT 1
**Common Law Fraud**
**Individually and on Behalf of the Nationwide Class or, in the Alternative, the State Subclasses**

87.    Plaintiffs reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

88.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class against Whirlpool as there are no true conflicts among the states' laws of fraud. In the alternative, Plaintiffs bring this claim on behalf of each of the State Subclasses against Whirlpool.

89.    Whirlpool manufactured, designed, advertised, and sold the Class Ovens in all 50 states. Whirlpool also drafted, distributed, and disseminated the same advertising materials in all 50 states, including on the website it maintains to advertise Class Ovens. Those materials

misrepresented, failed to disclose, and omitted any mention of the Defect.

90.    Additionally, Whirlpool made other material misrepresentations of facts regarding the quality of the Class Ovens and/or fraudulently concealed from and/or intentionally failed to disclose the Defect to Plaintiff and Class Members.

91.    Whirlpool knew that the Class Ovens suffered from an inherent defect and, thus, were defectively designed and/or manufactured and were not suitable for their intended use. Whirlpool knew this at the time of sale.

92.    Whirlpool concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Ovens.

93.    The Defect is latent and not something Plaintiffs and Class Members in the exercise of reasonable diligence could have discovered independently prior to purchase. The Defect is incapable of becoming exposed by reasonable inspection by purchasers.

94.    Whirlpool knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members.

95.    Whirlpool was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Ovens because Whirlpool was in an exclusive and superior position to know the true state of facts about the Defect contained in the Class Ovens; intentionally and actively concealed the Defect; and made incomplete or partial representations regarding the Class Ovens while withholding material facts from Plaintiffs and the Class members.

96.    Whirlpool had the capacity, and did, deceive Plaintiffs and Class Members into believing that the Class Ovens they purchased were of high quality and were reliable and functionable.

97.    The facts misrepresented, concealed, or not disclosed by Whirlpool to Plaintiffs and

Class Members were material in that a reasonable person would have considered them to be important in deciding whether to purchase the Class Ovens, or pay a lesser price for them, and were likely to deceive a reasonable person. The misrepresented and omitted facts also affected the basic advertised functions of the Class Ovens.

98.     Had Plaintiffs and Class Members known about the defective nature of the Class Ovens, they would not have purchased the Class Ovens or would have paid less for them.

99.     Whirlpool misrepresented, concealed, or failed to disclose the true nature of the Defect contained in the Class Ovens to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Whirlpool's misrepresentations and/or omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchases of the defective Class Ovens.

100.    Whirlpool continued to conceal the defective nature of the Class Ovens even after Plaintiffs and Class Members began to report the problems. Indeed, Whirlpool continues to conceal the true nature of the Defect today.

101.    As a direct and proximate result of Whirlpool's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase the defective Class Ovens and obtain restitution or (b) affirm their purchase of the Class Ovens and recover damages.

## COUNT 2
### Negligent Misrepresentation
**Individually and on Behalf of the Nationwide Class or, in the Alternative, the State Subclasses**

102.    Plaintiffs reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

103.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class. In the alternative, Plaintiffs bring this claim on behalf of each of the State

Subclasses against Whirlpool.

104.    As set forth herein, Whirlpool represented that the Class Ovens were high-end, durable, high-quality, and reliable. To communicate these representations and to convince Plaintiffs and members of the Classes, Defendant supplied information, including through its website, the website of its authorized retailers, its printed materials, its repair warranties, and its point-of-sale documentation. Defendant knew, or should have known, that this information was false and/or misleading and fraught with material omissions.

105.    The misrepresentations concerned material facts that influenced Plaintiffs' and members of the Class's decisions to purchase the Class Ovens.

106.    Defendant negligently made the misrepresentations and omissions with the understanding the Plaintiffs and Class members would rely on them.

107.    Plaintiffs and members of the Classes reasonably, justifiably, and detrimentally relied on the misrepresentations and omissions, and, as a direct and proximate result thereof, have and will continue to suffer damages in an amount to be determined at trial.

## COUNT 3
### Unjust Enrichment
**Individually and on Behalf of the Nationwide Class or, in the Alternative, the State Subclass**

108.    Plaintiffs reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

109.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class. In the alternative, Plaintiffs bring this claim on behalf of each of the State Subclasses against Whirlpool.

110.    This claim is pleaded in the alternative to the other warranty-based claims set forth herein should the Court deem the warranty claims unenforceable.

111.    As a result of Defendant's material deceptive advertising, marketing and/or sale of

its Class Ovens, Defendant was enriched at the expense of Plaintiffs and all other Nationwide Class members through their purchase of the ovens, because the ovens did not provide the benefits as represented.

112.    Whirlpool has voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Whirlpool's misconduct alleged herein, Plaintiff and the Class were not receiving products of the quality, nature, fitness, or value that had been represented by Whirlpool, and that a reasonable consumer would expect. Specifically, Plaintiff and the Class members expected that when they purchased their Class Ovens, they would not be manufactured with defective control panels.

113.    Whirlpool has been unjustly enriched by its fraudulent, deceptive, unlawful, and unfair conduct, and its withholding of benefits and unearned monies from Plaintiffs and the Class, at the expense of these parties.

114.    Equity and good conscience militate against permitting Whirlpool to retain these profits and benefits.

### COUNT 4
**UCC Breach Of Express Warranty**
**Failure to Repair or Replace**
**Individually and on Behalf of the Nationwide Class or, in the Alternative, the Illinois Subclass**

115.    Plaintiffs reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

116.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class. In the alternative, Plaintiffs bring this claim on behalf of each of the State Subclasses against Whirlpool.

117.    Each of the aforementioned states has adopted the portions of the Uniform Commercial Code ("UCC") concerning warranty claims into its state statutory system.

118.    Whirlpool is a "merchant" and "seller" as defined under the Uniform Commercial Code ("UCC").

119.    The Class Ovens are "goods" as defined under the UCC.

120.    Whirlpool provided all purchasers of the Class Ovens with the express warranties described herein, which became material parts of the bargain.

121.    Whirlpool provided Plaintiffs and the Class members with a limited warranty for repair or replacement of Class Ovens. Whirlpool warranted that for two years from the date of delivery Whirlpool "will pay for factory will pay for factory specified replacement parts and repair labor to correct defects in materials or workmanship that existed when this major appliance was purchased or, at its sole discretion, replace the product." For years three through five, Whirlpool warranted it "will pay for factory specified parts for the following components to correct non-cosmetic defects in materials or workmanship in these parts that prevent function of this major appliance and that existed when this major appliance was purchased."

> **TWO (2) YEAR LIMITED WARRANTY FROM THE DATE OF DELIVERY OF THE ORIGINAL PURCHASE (PARTS AND LABOR INCLUDED):** For two years from the date of delivery of original purchase, when this major appliance is installed, operated, and maintained according to instructions attached to or furnished with the product, JennAir brand of Whirlpool Corporation or Whirlpool Canada LP (hereafter "JennAir") will pay for factory specified replacement parts and repair labor to correct defects in materials or workmanship that existed when this major appliance was purchased or, at its sole discretion, replace the product. In the event of product replacement, your appliance will be warranted for the remaining term of the original unit's warranty period.
>
> **YEARS THREE (3) THROUGH FIVE (5) LIMITED WARRANTY FROM THE DATE OF DELIVERY OF THE ORIGINAL PURCHASE (CERTAIN COMPONENT PARTS):** In the third through fifth years from the date of delivery of the original purchase, when this major appliance is installed, operated and maintained according to instructions attached to or furnished with the product, JennAir will pay for factory specified parts for the following components to correct non-cosmetic defects in materials or workmanship in these parts that prevent function of this major appliance and that existed when this major appliance was purchased. This is a limited warranty on the below named parts only and does not include repair labor.

122.    The "below named parts" include the electric element, touch pad and microprocessor, glass ceramic cooktop (if due to thermal breakage), electronic controls, magnetron

tube, and sealed gas burners.

123.    Whirlpool breached its warranty by selling to Plaintiffs and Class members the Class Ovens that contained a defect—at the time of sale—in materials or workmanship (i.e., the Defect), which Defendant knew and knows, that makes the Class Ovens susceptible to failure within and just outside of the warranty period, and which causes the ovens to fail prematurely and well before the expiration of the ovens' useful life.

124.    Defendant further breached its warranty by failing to adequately repair and/or replace Plaintiffs' and other Class members' defective Class Ovens or parts necessary to adequately repair the Defect that existed at the time of sale. Instead of an adequate repair, Defendant routinely provides inadequate repairs that result in subsequent failures and warrant additional repairs and result in expenses to consumers.

125.    Accordingly, Defendant's limited remedy of repair or replacement is an inadequate remedy under the terms of the warranty such that the warranty fails of its essential purpose.

126.    Any attempt by Defendant to disclaim or limit its express warranties is unconscionable and unenforceable under the circumstances here. Defendant knew or should have known that the Class Ovens are plagued by the Defect; Defendant had unequal bargaining power and misrepresented the reliability, quality, performance, and qualities of the Class Ovens; and the limited remedies in Defendant's warranty unreasonably favors Defendant and fail Plaintiffs' reasonable expectations concerning product performance.

127.    Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without informing consumers about the Defect. Because Defendant had knowledge of the Defect and failed to disclose it prior to selling Class Ovens to Plaintiffs and Class members, and because Defendant knew that the Class Ovens were defective

and likely to fail shortly after the warranties purportedly expired, but failed to disclose the Defects to Plaintiffs and the other Class members, and because the remedy provided for under the terms of Defendant's warranty is inadequate and fails of its essential purpose, the durational warranty limitation (and all other limitations) is unenforceable because it is both procedurally and substantively unconscionable. Accordingly, consumers who have experienced Class Oven failures due to the Defect should not be precluded from bringing warranty claims under Whirlpool's warranty.

128.    Any purported warranty limitations excluding or limiting (a) labor and costs of labor and (b) incidental and consequential damages, are also procedurally and substantively unconscionable and thus fail under U.C.C. § 2-302.

129.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

130.    Defendant was provided notice of these issues by complaints lodged by consumers—including Plaintiffs as described above—directly over the phone and on internet consumer complaint boards, and elsewhere—which appliance manufacturers like Defendant routinely monitor—and further through reports by repair technicians and/or others, and internal investigations that must have occurred to allow Defendant to address problems brought to them by customers.

131.    Plaintiffs sent demand letters to Whirlpool, which specifically put Whirlpool on notice of its class-wide breaches of its express warranties and demanded adequate class-wide relief. Whirlpool has received adequate notice of its breaches and opportunity to cure, but it has failed to do so.

132.    As a direct and proximate cause of Whirlpool's breach, Plaintiffs and class members bought Class Ovens they otherwise would not have, overpaid for the Class Ovens, did not receive the benefit of their bargain, and their Class Ovens suffered a diminution in value, and Whirlpool has not offered an adequate remedy.

### COUNT 5
**Breach of Implied Warranty of Merchantability (Illinois)**
**810 ILCS 5/2-314**
**Plaintiff Gray Individually and on Behalf of the Illinois Subclass**

133.    Plaintiffs reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

134.    Plaintiff Gray brings this cause of action individually and on behalf of the members of the Illinois Subclass.

135.    Whirlpool is and was at all relevant times a "merchant" with respect to ovens under 810 ILCS 5/2-104(1) and a "seller" of ovens under 810 ILCS 5/2-103(1)(d ).

136.    The Class Ovens are and were at all relevant times "goods" within the meaning of 810 ILCS 5/2-105(1).

137.    A warranty that the Class Ovens were in merchantable condition and fit for the ordinary purpose for which ovens are used is implied by law under 810 ILCS 5/2-314. Whirlpool provided Plaintiff Gray and the Illinois Subclass members with an implied warranty that the Class Ovens and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

138.    Whirlpool knew or had reason to know of the specific use for which the Class Ovens were purchased. Whirlpool directly sold and marketed Class Ovens to customers through its own website as well as authorized retailers, like those from whom Plaintiff Gray and the Illinois Subclass members bought their Class Ovens. Whirlpool knew that the Class Ovens would and did

pass unchanged from the authorized retailers to Plaintiff Gray and the Illinois Subclass members, with no modification to the defective Class Ovens.

139.    Contrary to the applicable implied warranties, the Class Ovens at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Ovens were and are defective at the time of sale and thereafter as more fully described above. Whirlpool knew of this Defect at the time the sale transactions occurred.

140.    As a result of Whirlpool's breach of the applicable implied warranties, Plaintiff Gray and the Illinois Subclass members suffered an ascertainable loss of money, property, and/or value of their Class Ovens. Additionally, as a result of the Defect, Plaintiff Gray and the Illinois Subclass members were harmed and suffered actual damages in that the Class Ovens are substantially certain to fail before their expected useful life has run.

141.    Plaintiff Gray and the Illinois Subclass members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Whirlpool's conduct described herein.

142.    Plaintiff Gray and the Illinois Subclass members were not required to notify Whirlpool of the breach because it would have been futile. Nevertheless, Plaintiff Gray served Whirlpool with a demand letter notifying it of its breaches of implied warranty on April 30, 2025. Whirlpool was also on notice of the Defect, as alleged above. Whirlpool has received adequate notice of its breaches and opportunity to cure, but it has failed to do so.

143.    Plaintiff Gray and the Illinois Subclass have had sufficient dealings with Whirlpool or its authorized retailers or agents to establish privity of contract. Notwithstanding this, Plaintiffs and Class members are intended third-party beneficiaries of contracts between Defendant and its authorized retailers, and specifically, of Defendant's implied warranties. Defendant's retailers and

distributors are intermediaries between Defendant and consumers. These intermediaries sell ovens

to consumers and are not, themselves, consumers of ovens, and therefore have no rights against

Defendant with respect to Plaintiffs' and Class members' purchases of Class Ovens. Defendant's

warranties were designed for the benefit of consumers who purchased Class Ovens.

144.    Whirlpool did _not disclaim_ the implied warranty of merchantability. Instead,

Whirlpool provided that its implied warranty **extended "to ten years or the shortest period**

**allowed by law."**

<u>DISCLAIMER OF IMPLIED WARRANTIES</u>

Implied warranties, including any implied warranty of merchantability or implied warranty of fitness for a particular purpose, are limited to ten years or the shortest period allowed by law. Some states and provinces do not allow limitations on the duration of implied warranties of merchantability or fitness, so this limitation may not apply to you.

145.    In any event, in its capacity as a supplier and/or warrantor, and by the conduct

described herein, any attempt by Whirlpool to limit the implied warranty in a manner that would

exclude or limit coverage for the Defect would be unconscionable. Whirlpool's warranties were

adhesive and did not permit negotiations. Whirlpool possessed superior and exclusive knowledge

of the Defect, which is a latent defect, prior to offering the ovens for sale. Whirlpool concealed

and did not disclose this Defect, and Whirlpool did not remedy the Defect prior to sale (or

afterward).

146.    Additionally, Whirlpool's attempts to disclaim or limit the implied warranty were

ineffectual pursuant to 810 ILCS 5/2-316.

147.    As a direct and proximate cause of Whirlpool's breach, Plaintiff Gray and the

Illinois Subclass members suffered damages and continue to suffer damages, including economic

damages at the point of sale and diminution of value of their Class Ovens. Additionally, Plaintiff

Gray and the Illinois Subclass members have incurred or will incur additional economic damages,

including for repairs.

148.    As a direct and proximate result of Whirlpool's breach of the implied warranty of merchantability, Plaintiff Gray and the Illinois Subclass members have been damaged in an amount to be proven at trial.

## COUNT 6
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")
### 815 Ill. Comp. Stat. §§ 505/1–505/12
### Plaintiff Gray Individually and on Behalf of the Illinois Subclass

149.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

150.    Plaintiff Gray brings this cause of action individually and on behalf of the Illinois Subclass.

151.    Whirlpool is a "person" as defined in 815 ILCS 505/1(c).

152.    Whirlpool is involved in the "trade or commerce" of "merchandise" as defined in 815 ILCS 505/1(b) and (f).

153.    Plaintiff Gray and the Illinois Subclass class members are "consumer(s)" as defined in 815 ILCS 505/1(e).

154.    The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

155.    Whirlpool's acts and practices, described herein, are unfair and deceptive in

violation of Illinois law because it violates Illinois consumer protection laws, common law, and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

156.    Whirlpool acted in an unfair and deceptive manner in at least the following respects:

    a.    Whirlpool promoted and sold Class Ovens it knew were defective;

    b.    Whirlpool failed to disclose the Defect;

    c.    Whirlpool represented that Class Ovens possess particular qualities, functions, characteristics, uses, or benefits that were inconsistent with Whirlpool's actual knowledge of them;

    d.    Whirlpool failed to make repairs or made repairs and provided replacements that caused Plaintiff and the Illinois Subclass members to experience instances of failure; and

    e.    Whirlpool minimized the scope and severity of the problems with the Class Ovens, refused to acknowledge that they are defective, and failed to provide adequate relief to consumers.

157.    Whirlpool's unfair or deceptive acts or practices occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the purchasing public.

158.    Whirlpool knew, should have known, or was reckless in not knowing that the Class Ovens were defective, would fail prematurely, and were not suitable for their intended use.

159.    Whirlpool was under a duty to Plaintiffs and the Illinois Subclass members to disclose the defective nature of the Class Ovens and the Defect because:

    a.    Whirlpool knew of but actively concealed the Defect from Plaintiff and the Illinois Subclass;

b.  Whirlpool was in a superior and exclusive position to know the true facts about the Defect, which affects the central functionality of the ovens, and Plaintiffs and the Subclass members could not reasonably have been expected to discover that the Class Ovens contained the Defect until it manifested, which Whirlpool knew; and

c.  Whirlpool made partial representations that its ovens were high-end, durable, high-quality, and reliable but suppressed facts regarding the Defect.

160.    The facts that Whirlpool misrepresented to and concealed from Plaintiff and the other Illinois Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Ovens or pay a lesser price for them.

161.    The Defect affects the central functionality of the Class Ovens because it renders the basic, intended function of the ovens completely useless.

162.    In failing to disclose the material Defect, Whirlpool has knowingly and intentionally concealed material facts in breach of its duty to disclose.

163.    Plaintiff Gray and the Illinois Subclass members have suffered injury in fact and actual damages resulting from Whirlpool's material misrepresentations and omissions, including by paying an inflated purchase price for their Class Ovens and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff Gray and the Illinois Subclass known about the defective nature of the Class Ovens and the Defect, they would not have purchased their Class Ovens or would have paid less in doing so.

164.    As a direct and proximate result of Whirlpool's unfair and deceptive conduct, therefore, Plaintiff and the Illinois Subclass members have been harmed.

165.    The gravity of harm resulting from Whirlpool's unfair conduct outweighs any

potential utility. The practice of selling defective Class Ovens without providing an adequate remedy to cure the Defect harms the public at large and is part of a common and uniform course of wrongful conduct.

166.    The harm from Whirlpool's conduct was not reasonably avoidable by consumers. Even after receiving consumer complaints, Whirlpool did not disclose the Defect. Plaintiff Gray and the Illinois Subclass members did not know of, and had no reasonable means of discovering, that Class Ovens are defective.

167.    Whirlpool's deceptive and unfair trade practices, including its misrepresentations and omissions described herein, were likely to mislead consumers acting reasonably under the circumstances.

168.    Plaintiff Gray and the Illinois Subclass members are entitled to recover their actual damages and reasonable attorneys' fees under 815 ILCS 505/2S; 815 ILCS 505/10a(a).

169.    Plaintiff and the Illinois Subclass members also seek injunctive relief under 815 ILCS 505/10a(c).

170.    Plaintiff Gray and the Illinois Subclass members also seek punitive damages for Whirlpool's willful violations of the ICFA under 815 ILCS 505/2AA.

171.    Accordingly, Plaintiff and Class members are entitled to relief under the ICFA, including restitution and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

172.    Pursuant to 815 ILCS § 505/10a(d), Plaintiffs will serve the Illinois Attorney General with a copy of this Complaint within 10 days of filing.

**COUNT 7**
**Violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA")**
**815 Ill. Comp. Stat. §§ 510/1–510/7**
**Plaintiff Gray Individually and on Behalf of the Illinois Subclass**

173.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

174.    Plaintiff Gray brings this cause of action individually and on behalf of the Illinois Subclass.

175.    Whirlpool is a "person" as defined in 815 ILCS 510/1(5).

176.    The IUDTPA states: "A person engages in a deceptive trade practice when, in the course of his or her business, violation, or occupation, the person … represents that the goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another … advertises goods or services with the intent not to sell them as advertised … engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding. " *See* 815 ILCS 510/2(a)(5), (7), (9), and (12).

177.    Whirlpool engaged in deceptive practices in violation of the IUDTPA by the practices described above and by knowingly and intentionally concealing from Plaintiff and the Illinois Subclass members that the Class Ovens suffer from the Defect (and the costs, risks, and diminished value of the Class Ovens as a result of this Defect). Whirlpool's conduct violated at least the following enumerated IUDTPA provisions:

   a.    Whirlpool represented that Class Ovens have sponsorship, approval, characteristics, uses, or benefits that they do not have in violation of section 510/2(a)(5);

45

b.  Whirlpool represented that Class Ovens are of a particular standard, quality, or grade but are of another in violation of section 510/2(a)(7);

c.  Whirlpool advertised Class Ovens with the intent not to sell them as advertised in violation of section 510/2(a)(9); and

d.  Whirlpool made representations about the Class Ovens, and advertised about the same in a way that created confusion or misunderstanding amongst Plaintiff and class members in violation of section 510/2(a)(12).

178.    Whirlpool's deceptive practices occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the purchasing public.

179.    Whirlpool knew, should have known, or was reckless in not knowing that the Class Ovens were defective, would fail prematurely, and were not suitable for their intended use.

180.    Whirlpool was under a duty to Plaintiff and the Illinois Subclass members to disclose the defective nature of the Class Ovens and the Defect because:

a.  Whirlpool knew of but actively concealed the Defect from Plaintiffs and the Illinois Subclass;

b.  Whirlpool was in a superior and exclusive position to know the true facts about the Defect, which affects the central functionality of the ovens, and Plaintiff and the Subclass members could not reasonably have been expected to discover that the Class Ovens contained the Defect until it manifested, which Whirlpool knew; and

c.  Whirlpool made partial representations regarding the reliability, and quality but suppressed facts regarding the Defect.

181.    The facts that Whirlpool misrepresented to and concealed from Plaintiffs and the other Illinois Subclass members are material because a reasonable consumer would have

considered them to be important in deciding whether to purchase their Class Ovens or pay a lesser price for them.

182.    The Defect affects the central functionality of the ovens because it renders essential functions of the ovens completely useless.

183.    By failing to disclose the material Defect and the harm that may result from it, Whirlpool has knowingly and intentionally concealed material facts and breached its duty to disclose this material information to consumers.

184.    Plaintiff Gray and the Illinois Subclass have suffered injury in fact and actual damages resulting from Whirlpool's misrepresentations and omissions, including by paying an inflated purchase price for their Class Ovens and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff Gray and the Illinois Subclass known about the defective nature of the Class Ovens and the Defect, they would not have purchased their Class Ovens or would have paid less in doing so.

185.     As a direct and proximate result of Whirlpool's deceptive conduct, Plaintiff Gray and the Illinois Subclass have been harmed.

186.    Pursuant to 815 ILCS 510/3, Plaintiff Gray, individually and on behalf of the Illinois Subclass, seeks injunctive relief, attorneys' fees, costs, as well as any other relief the Court may deem just or proper for Whirlpool's violation of the IUDTPA.

## COUNT 8
### Ohio Implied Warranty in Tort
### Plaintiff Loeffler Individually and on Behalf of the Ohio Subclass

187.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

188.    Plaintiff Loeffler brings this cause of action individually and on behalf of the Ohio

Subclass.

189.    The Defect existed in all Class Ovens at the time Whirlpool manufactured them.

190.    As detailed herein, the Class Ovens contain the Defect, which causes the control panels to fail and renders the ovens completely inoperable. Therefore, the Class Ovens are not of merchantable quality or fit for their intended use.

191.    The Defect in the Class Ovens was the direct and proximate cause of economic damages to Plaintiff Loeffler and members of the Ohio Subclass.

**COUNT 9**
**Ohio Consumer Sales Practices Act ("OCSPA")**
**Ohio Rev. Code Ann. §§ 1345.01–1345.99**
**Plaintiff Loffler Individually and on Behalf of the Ohio Subclass**

192.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

193.    Plaintiff Loeffler brings this cause of action individually and on behalf of the Ohio Subclass.

194.    Whirlpool is a "supplier" of Class Ovens within the meaning of the OCSPA. Ohio Rev. Code Ann. § 1345.01(C).

195.    The OCSPA applies to the sale of consumer goods "to an individual for purposes that are primarily personal, family, or household [uses]." § 1345.01(A). Plaintiff Loeffler and Ohio Subclass members purchased primarily for personal, family, or household uses.

196.    The OCSPA broadly prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions, § 1345.02(A). As detailed herein, Whirlpool's conduct in this case violated the OCSPA because it was unfair, deceptive, and unconscionable.

197.    Whirlpool acted in the face of prior notice that its conduct was deceptive, unfair, or unconscionable. Whirlpool's material omissions and misrepresentations that the Class Ovens were

high-end, durable, high-quality, and reliable constitute violations of the OCSPA.

198.    The Ohio Attorney General has made available for public inspection prior state court decisions that have held acts and omissions, similar to those of Whirlpool detailed in this complaint, constitute deceptive sales practices in violation of the OCSPA, including, but not limited to: the failure to honor implied warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a defect. These cases include, but are not limited to, the following: *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); *State ex rel. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); *Bellinger v. Hewlett-Packard Co.*, 2002 WL 533403 (Ohio. Ct. App. Apr. 10, 2002) (OPIF #10002077); *Borror v. MarineMax of Ohio*, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); *State ex rel. Petro v. Craftmatic Organization, Inc.* (OPIF #10002347); *Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586); *State ex rel. Brown v. Lyons, et al.* (OPIF #10000304); *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427); *Khouri v. Lewis* (OPIF #10001995); *Mosley v. Performance Mitsubishi aka Automanage, Inc.* (OPIF #10001326); *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524); and *Brown v. Spears* (OPIF #10000403).

199.    As a direct and proximate result of Whirlpool's violations of the OCSPA, Plaintiff Loeffler and members of the Ohio Subclass have been injured and suffered ascertainable loss.

200.    Plaintiff Loeffler and the Ohio Subclass members have suffered injuries in fact and actual damages, including, but not limited to, out-of-pocket repair expenses, overpayment for their Class Ovens and financial losses from the devaluation of their Class Ovens, all of which resulted from Whirlpool's conduct and practices in violation of the OCSPA.

201.    These injuries are of the type that the OCSPA was designed to prevent and are the

direct and proximate result of Whirlpool's unlawful conduct.

## COUNT 10
### Breach of Implied Warranty of Merchantability (Pennsylvania)
### 13 Pa. Cons. Stat. Ann. § 2314
### Plaintiff Ley Individually and on Behalf of the Pennsylvania Subclass

202.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

203.     Plaintiff Ley brings this cause of action individually and on behalf of the Pennsylvania Subclass.

204.     Whirlpool is and was at all relevant times a "merchant" with respect to ovens under Pa. Cons. Stat. § 2104 and a "seller" of ovens under § 2103(a).

205.     The Class Ovens are and were at all relevant times "goods" within the meaning of § 2105(a).

206.     A warranty that the Class Ovens were in merchantable condition and fit for the ordinary purpose for which ovens are used is implied by law under § 2314. Whirlpool provided Plaintiff Ley and the Pennsylvania Subclass members with an implied warranty that the Class Ovens and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

207.     Whirlpool knew or had reason to know of the specific use for which the Class Ovens were purchased. Whirlpool directly sold and marketed Class Ovens to customers through its own website as well as authorized retailers, like those from whom Plaintiff Ley and the Pennsylvania Subclass members bought their Class Ovens. Whirlpool knew that the Class Ovens would and did pass unchanged from the authorized retailers to Plaintiff Ley and the Pennsylvania Subclass members, with no modification to the defective Class Ovens.

208.     Contrary to the applicable implied warranties, the Class Ovens at the time of sale

50

and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Ovens were and are defective at the time of sale and thereafter as more fully described above. Whirlpool knew of this Defect at the time the sale transactions occurred.

209.    As a result of Whirlpool's breach of the applicable implied warranties, Plaintiff Ley and the Pennsylvania Subclass members suffered an ascertainable loss of money, property, and/or value of their Class Ovens. Additionally, as a result of the Defect, Plaintiff Ley and the Pennsylvania Subclass members were harmed and suffered actual damages in that the Class Ovens are substantially certain to fail before their expected useful life has run.

210.    Plaintiff Ley and the Pennsylvania Subclass members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Whirlpool's conduct described herein.

211.    Plaintiff Ley and the Pennsylvania Subclass members were not required to notify Whirlpool of the breach because it would have been futile. Nevertheless, Plaintiff Ley served Whirlpool with a demand letter notifying it of its breaches of implied warranty on April 14, 2025. Whirlpool was also on notice of the Defect, as alleged above. Whirlpool has received adequate notice of its breaches and opportunity to cure, but it has failed to do so.

212.    Plaintiff Ley and the Pennsylvania Subclass have had sufficient dealings with Whirlpool or its authorized retailers or agents to establish privity of contract. Notwithstanding this, Plaintiffs and Class members are intended third-party beneficiaries of contracts between Defendant and its authorized retailers, and specifically, of Defendant's implied warranties. Defendant's retailers and distributors are intermediaries between Defendant and consumers. These intermediaries sell ovens to consumers and are not, themselves, consumers of ovens, and therefore have no rights against Defendant with respect to Plaintiffs' and Class members' purchases of Class

Ovens. Defendant's warranties were designed for the benefit of consumers who purchased Class Ovens.

213.    Whirlpool did *not disclaim* the implied warranty of merchantability. Instead, Whirlpool provided that its implied warranty **extended "to ten years or the shortest period allowed by law."**

---

**DISCLAIMER OF IMPLIED WARRANTIES**

Implied warranties, including any implied warranty of merchantability or implied warranty of fitness for a particular purpose, are limited to ten years or the shortest period allowed by law. Some states and provinces do not allow limitations on the duration of implied warranties of merchantability or fitness, so this limitation may not apply to you.

---

214.    In any event, in its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Whirlpool to limit the implied warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Whirlpool's warranties were adhesive and did not permit negotiations. Whirlpool possessed superior and exclusive knowledge of the Defect, which is a latent defect, prior to offering the ovens for sale. Whirlpool concealed and did not disclose this Defect, and Whirlpool did not remedy the Defect prior to sale (or afterward).

215.    Additionally, Whirlpool's attempts to disclaim or limit the implied warranty were ineffectual pursuant to § 2316.

216.    As a direct and proximate cause of Whirlpool's breach, Plaintiff Ley and the Pennsylvania Subclass members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Ovens. Additionally, Plaintiff Ley and the Pennsylvania Subclass members have incurred or will incur additional economic damages, including for repairs.

217.    As a direct and proximate result of Whirlpool's breach of the implied warranty of

merchantability, Plaintiff Ley and the Pennsylvania Subclass members have been damaged in an amount to be proven at trial.

## COUNT 11
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PCPL")**
**73 Pa. Cons. Stat. Ann. §§ 201-1 – 201-10**
**Plaintiff Ley Individually and on Behalf of the Pennsylvania Subclass**

218.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

219.    Plaintiff Ley brings this cause of action individually and on behalf of the Pennsylvania Subclass.

220.    By making material misrepresentation and failing to disclose and actively concealing the Defect, Whirlpool engaged in deceptive business practices prohibited by the PCPL. Whirlpool's violations, as detailed herein, include but are not limited to: (i) representing that the Class Ovens have characteristics, uses, benefits, and qualities which they do not have; (ii) representing that the Class Ovens are of a particular standard, quality, and grade, when they are not; (iii) advertising Class Ovens with the intent not to sell them as advertised; and (iv) engaging in acts or practices that are otherwise unfair, misleading, false, or deceptive to the consumer.

221.    Whirlpool also violated the PCPL by failing to comply with the terms of its written warranty given to the buyer at, prior to or after, a contract for the purchase of goods or services is made (Pa. Cons. Stat. § 73 P.S. § 201-2 (xiv)).

222.    Whirlpool knew that its Class Ovens were defectively designed or manufactured, were virtually certain to fail, and were not suitable for their intended use. Whirlpool nevertheless failed to warn Plaintiff Ley and the Pennsylvania Class members about these defects despite having a duty to do so.

223.    Whirlpool owed Plaintiff Ley and the Pennsylvania Class members a duty to disclose the defective nature of the Class Ovens, because Whirlpool:

(a)    Possessed exclusive knowledge of the Defect that renders the Class Ovens inoperable;

(b)    Intentionally concealed the Defect with Class Ovens through its proffered repair of replacing defective control panels with more defective control panels; and/or

(c)    Made incomplete representations about the characteristics and performance of the Class Ovens generally, while purposefully withholding material facts from Plaintiff Ley and the Pennsylvania Class members that contradicted these representations.

224.    Whirlpool's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Ley and the Pennsylvania Class members, about the true quality, durability, reliability, performance, and characteristics of the Class Ovens.

225.    Additionally, Whirlpool's breaches of warranty constitute unfair and deceptive acts under Pennsylvania law.  Whirlpool warranted the product against manufacturing defects and was further obligated under its warranty to provide necessary replacement parts to remedy manufacturing defects that existed at the time of sale. Whirlpool should have provided replacement of all such parts and labor necessary to remedy the Defect.  Instead, Whirlpool replaced defective parts with more defective parts.

226.    As a result of its violations of the PCPL as detailed above, Whirlpool caused actual harm and damage to Plaintiff Ley and the Pennsylvania Class members.

227.    Plaintiff Ley and the Pennsylvania Class members sustained damages as a result of Whirlpool's unlawful acts and are, therefore, entitled to damages and other relief as provided under the PCPL, including treble damages.

228.    Plaintiff Ley and the Pennsylvania Class members also seeks court costs and attorneys' fees as a result of Whirlpool's violations of the PCPL as provided in Pa. Stat. Ann. § 201-9.2.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court certify the proposed Class, designate Plaintiffs as Class representatives, appoint the undersigned as Class Counsel, and enter an Order providing for the following:

a.  An Order that Whirlpool notify Class Oven owners of the Defect;

b.  An Order permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

c.  Injunctive relief in the form of a recall or a free replacement/repair program;

d.  Equitable relief, including in the form of a buyback of the Class Ovens;

e.  Compensatory damages – including for overpayment at the point of sale to Plaintiffs and class members in an amount to be proven at trial;

f.  Compensating Class Oven owners for incurred costs and/or labor to repair the defective Class Ovens;

g.  Other costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

h.  An Order that Whirlpool correct its manufacturing process to ensure that all Class Ovens are manufactured with adequate materials and design;

i.  An Order that Whirlpool replace the defective Class Ovens or all such parts as are necessary to eliminate the defect or perform sufficient repair to correct the defect;

j.  An Order that Whirlpool cease the sale of Class Ovens and otherwise cease to engage in violations of state consumer protection laws;

k.  An Order requiring Whirlpool to pay both pre- and post- judgement interest on any amounts awarded;

l.  An award for reasonable attorneys' fees and costs as permitted by law; and

m.  An Order entering such other relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: May 27, 2025                          Respectfully submitted,

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

*By: /s/ Steven A. Schwartz*
Steven A. Schwartz
Timothy N. Mathews *(pro hac vice forthcoming)*
Alex M. Kashurba
Zachary P. Beatty *(pro hac vice forthcoming)*
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
sas@chimicles.com
tnm@chimicles.com
amk@chimicles.com
zpb@chimicles.com